IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. ASHING

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

REBECCA ASHING, APPELLANT.

Filed November 18, 2025.    No. A-24-967.

Appeal from the District Court for Box Butte County: TRAVIS P. O'GORMAN, Judge. Affirmed in part, and in part vacated and remanded with directions.

Maren Lynn Chaloupka, of Chaloupka Law, L.L.C., for appellant.

Michael T. Hilgers, Attorney General, and Nathan A. Liss for appellee.

RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

RIEDMANN, Chief Judge.

## I. INTRODUCTION

Rebecca Ashing was convicted of various criminal offenses following a bench trial in the district court for Box Butte County. On direct appeal, she argues through new counsel that her trial counsel was ineffective and that the district court erred by denying her insanity defense. Because of plain errors related to sentencing, we partially vacate Ashing's sentences and remand with directions for resentencing. We otherwise affirm the order of the district court.

## II. BACKGROUND

On July 13, 2023, Ashing texted her husband, Cody Dauel, asking him to meet her at their home. When he arrived, Ashing was in her vehicle smoking a cigarette. Dauel went inside and Ashing met him there. He began talking to her and asking her questions, and she was giving short, one-worded answers.

- 1 -

Ashing eventually asked Dauel for a hug. As she got up from the couch and leaned in for the hug, Ashing swung a knife from behind her back and "nicked" Dauel's throat. Dauel "backpedal[ed] through the house" while Ashing followed him. He asked her "why," and about halfway through the house, she responded that he had ruined her life. As he tried to unlock the door to leave the home, she stabbed him in the chest.

Dauel eventually managed to unlock the door and leave the home. Ashing walked slowly and silently behind him. However, when Dauel stopped to catch his breath in front of his vehicle, he observed Ashing walking over to the front porch.

Dauel began walking away from the home while on the phone with 911. When he had walked further down the street, he observed that Ashing was sitting on the porch "just kind of staring off." An ambulance arrived, and Dauel was transported to the hospital.

Police arrived at the couple's residence and observed that Ashing was very docile and expressionless. She was read her *Miranda* rights and was asked if she understood them. In response, she asked if she could "plead the Fifth," stated she did not want to speak with the officers, and asked for an attorney.

Ashing was then taken to the hospital to treat a laceration wound. She was quiet and appeared to be in shock while in the ambulance. Ashing informed staff that she had felt suicidal a few days prior to the stabbing and had acquired a gun to attempt suicide but decided that "she wanted to live." After receiving stitches, Ashing was arrested and transported to jail.

In August 2023, the State filed an information in the district court charging Ashing with count I, attempted first degree murder; count II, use of a deadly weapon to commit a felony; count III, first degree domestic assault; and count IV, second degree domestic assault. Ashing entered not guilty pleas to the charges.

Through her counsel, Ashing filed a motion for a competency evaluation and requested the court order that she be examined by a mental health professional to inquire into whether she was sane at the time she allegedly committed the offense. She additionally waived her right to a jury trial and filed a motion for a bench trial, which was granted.

Trial was held in July 2024. Dauel, Ashing's aunt, Kristie Mitchell, her mother, Becky Hanley, and various other witnesses testified. Both Ashing and the State called expert witnesses to opine regarding whether Ashing was legally insane at the time of the offense. The experts' reports were also offered and received into evidence.

Dr. Klaus Hartmann, a forensic psychiatrist, testified on Ashing's behalf. He opined that "based on [Ashing] being ill before the act occurred and found to be ill directly after the act occurred," he believed "that she was mentally ill and psychotic when the [stabbing] occurred."

Hartmann's report explained that "a number of factors indicate[d] that [Ashing] was suffering from an increasingly serious mental illness prior and during the index offenses." He had interviewed Mitchell, Hanley, and Dauel, and all three had reported that, during the weeks preceding the stabbing, Ashing's behavior had been abnormal. Ashing had been staring into space, she walked miles barefoot to Mitchell's work after leaving her car parked far away, and she was taken to the hospital just days before the stabbing because she was "mentally ill and a danger to herself." Her family had also considered taking her for mental health treatment due to her increasingly severe problems, and they described her as "poorly functional, unable to concentrate and stay focused, and being too distressed to live with [Dauel]."

Hartmann's report further indicated that Ashing had become increasingly paranoid and noted she had been experiencing delusions regarding the FBI. Ashing felt that her phone was "hacked" and that she was microchipped by the FBI. She apparently believed the FBI was tracking her and plotting to frame her for murder.

Hartmann learned that, when Ashing arrived at jail, she was placed on suicide precaution, and she talked about hearing voices in her head. During booking, jail staff felt she had psychiatric needs. Thus, an interview with a psychiatrist took place 2 days after booking. He noted that Ashing was placed on an antidepressant medication after this appointment and that she eventually was prescribed an antipsychotic medication.

Hartmann's opinion was also based in part on his interview with Ashing. During the interview, she reported experiencing "command hallucinations" telling her to harm her family members. She reported that she did not remember whether she thought her actions were okay, or whether she understood their consequences, at the time of the stabbing. Ashing informed him that she had been previously diagnosed with bipolar disorder and a dissociative disorder, and that she believed the FBI would still eventually come after her some day in the future.

Hartmann observed there was no information to indicate that Ashing planned and prepared the stabbing. Rather, his report stated there was no apparent motive other than psychosis or dissociation at the time of the offense. He did acknowledge, however, that "some factors point[ed] to [Ashing] having been sane at the time of the incident." These included "pleading the Fifth," asking for a lawyer, hiding her hand holding the knife behind her back, and stabbing Dauel after asking for a hug; all of which indicated she had acted intentionally. The police reports also stated that Ashing had told Hanley, after the stabbing, that Dauel had pushed her before the attack. These reports described that Ashing went to her knees and held her hands up when officers arrived.

Hartmann determined that Ashing was experiencing delusions and suffering from "command hallucinations besides a mood disorder" at the time of the offense and that, "[w]hen not acutely ill, she was never violent." He noted that "even [Dauel], the victim, state[d] that she acted like a robot after the stabbing" and that he considered her to not have been right in her mind. According to Hartmann, when not ill, Ashing had worked through prior conflicts with Dauel in a nonviolent manner. Moreover, Ashing made no attempt to escape or to avoid detection after the stabbing. In view of this information, Hartmann determined that Ashing was suffering from a psychosis or a dissociative disorder at the time of the stabbing and, uncharacteristically for her, acted in a violent manner as a result of her mental illness.

Ultimately, Hartmann opined, to a reasonable degree of medical certainty, that Ashing was suffering from a major mental disorder and did not know what she was doing or that it was wrong, and thus that she was insane at the time of the stabbing.

The State called Dr. Rosanna Jones-Thurman, a licensed psychologist, as a rebuttal witness. Jones-Thurman had performed a psychological evaluation of Ashing, reviewed Hartmann's report, and disagreed with his conclusion. Although Hartmann had testified that Ashing's behavior leading up to the stabbing showed that she was insane at the time of the offense, Jones-Thurman testified that people with mental health issues, who have psychotic episodes, also have periods of lucidity, and she had not seen any evidence that Ashing had a psychotic episode on the day of the offense.

Despite Mitchell, Hanley, and Dauel reporting "some odd and unusual behaviors," and Ashing reporting an extensive history of mental health treatment, Jones-Thurman had not received records to corroborate this. There did not appear to be "any significant type of record indicating that anyone believed [Ashing] to be unsafe towards herself or others or that she would cause any bodily harm to anyone." Therefore, it did not appear to Jones-Thurman that there was any diagnosis of schizophrenia, psychotic disorder, antisocial personality disorder, bipolar disorder, or other issues that may be seen with "aggressive behaviors." Further, Jones-Thurman's evaluation stated that she had performed four psychological tests of Ashing and the results of two of these tests suggested Ashing was malingering or exaggerating her mental illness and symptoms.

Jones-Thurman opined that although Ashing might have been suffering from psychological issues, such issues were "not deemed to be clear by any evidence presented to [her]" and there was no corroboration of severe or significant mental health issues at the time Ashing stabbed Dauel. Rather, when she was being arrested, Ashing did not appear to have any significant cognitive or psychotic processes. Although Ashing did not talk or engage much during her arrest, she also was not combative, delusional, or psychotic.

Jones-Thurman noted that, because Ashing had contacted Dauel, set up the meeting, driven herself to their home, "deliberately hid a knife behind her back," stabbed him, then followed him down the street, her actions indicated "malicious intent." This showed that Ashing's executive functioning was unimpaired.

In conclusion, Jones-Thurman opined that Ashing was not insane at the time of the offense.

Hartmann authored a response to Jones-Thurman's psychological evaluation, which was received into evidence. Hartmann stated he was "secure in [his] opinion" and that Jones-Thurman's evaluation "at times lack[ed] precision and supporting evidence for her conclusion." He was "alarmed that [Jones-Thurman] largely based her opinion on psychological testing which, according to [other] psychological experts, is inadequate and below the standard expected." Overall, he disagreed with Jones-Thurman's interpretation of certain facts and believed there was ample indication Ashing was not malingering, but, rather, that she suffered from a psychological condition.

Jones-Thurman responded in writing to Hartmann's critique of her psychological evaluation and her response was received into evidence. She stated that the "majority of Dr. Hartmann's letter focused on the psychological testing [she] performed and his critique of such." However, "Hartmann [was] not qualified under his licensure in the state of Nebraska to comment on the psychological testing" because he is a psychiatrist, rather than psychologist.

Ashing called her own rebuttal witness to critique the testing methodology utilized by Jones-Thurman in her psychological testing. Dr. Jennifer Cimpl Bohn, a licensed psychologist, testified that the testing methods used by Jones-Thurman were only "screeners," which could indicate that an individual *may* be malingering or exaggerating their mental health symptoms. However, additional testing would be necessary to confirm whether the person was in fact malingering or exaggerating. Thus, Cimpl Bohn testified the "screeners" were unable to support Jones-Thurman's finding that Ashing was definitively malingering.

The court issued a written verdict in which it rejected Ashing's insanity defense and found her guilty of the charges in the information. It stated that it agreed with Jones-Thurman that "although [Ashing] may have acted oddly or in some other type of strange manner in the days and

weeks leading up to the stabbing, there [was] no evidence of any type of psychotic function at the time of the stabbing."

The court noted that Ashing followed Dauel after the stabbing, did not offer him aid or assistance, nor did she seem upset or emotional. It also observed that she later indicated to officers that she understood her *Miranda* rights and wanted to "plead the Fifth," and that she "made up the story" about Dauel having pushed her in a confrontation prior to her stabbing him. According to the court, these facts showed Ashing was aware of the difference between right and wrong at the time of the stabbing. It ultimately found that she failed to carry her burden with regard to her insanity defense; she was then found guilty of the charges in the information.

The court scheduled sentencing and ordered a presentence investigation report (PSI) be completed. In August 2024, the court, after reviewing the PSI, ordered a 90-day evaluation to assist in determining the appropriate sentences for Ashing. The sentencing hearing was held in December and Ashing was sentenced to a total of 25 to 35 years' incarceration. She now appeals.

## III. ASSIGNMENTS OF ERROR

Ashing assigns as error, restated, that (1) the strategy used by trial counsel to present the insanity defense was unreasonable and resulted in ineffective assistance of counsel which prejudiced her, and (2) alternatively, the district court erred in finding that the State had met its burden of proof to show she was sane at the time of stabbing.

## IV. STANDARD OF REVIEW

Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *State v. John*, 310 Neb. 958, 969 N.W.2d 894 (2022).

The verdict of the finder of fact on the issue of insanity will not be disturbed unless there is insufficient evidence to support such a finding. *Id*.

## V. ANALYSIS

### 1. INEFFECTIVE ASSISTANCE OF COUNSEL

Ashing assigns that her trial counsel was ineffective because counsel's presentation of the insanity defense constituted an unreasonable trial strategy. Specifically, Ashing argues that her trial counsel was ineffective because counsel (1) misunderstood the law behind the insanity defense, (2) failed to adequately prepare the expert witness, and (3) failed to recall Dauel as a defense witness.

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Rezac*, 318 Neb. 352, 15 N.W.3d 705 (2025). However, the fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id*. The determining factor is whether the record is sufficient to adequately review the question. *Id*. The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish

prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id*.

Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id*. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *State v. Vanderpool*, 286 Neb. 111, 835 N.W.2d 52 (2013). However, when a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; but an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. See *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020).

(a) Understanding of Law

Ashing argues that her trial counsel misunderstood the law because counsel believed an insanity defense may be supported by evidence that a defendant has a serious mental illness "in general," rather than at the time the offense was committed. Brief for appellant at 16. She asserts that trial counsel's elicitation of testimony from Hartmann, which concerned Ashing's behaviors from the days prior to the offense, was not enough to show she was insane at the time she stabbed Dauel. Accordingly, she argues "the record indicates that trial counsel did not understand that the current state of Nebraska law requires a defendant to show how yesterday's symptoms are part of today's serious mental illness," and that a trial strategy based on a misunderstanding of the law is not reasonable. *Id*. at 17.

Generally, under Nebraska's common-law definition, the insanity defense requires proof that (1) the defendant had a mental disease or defect *at the time of the crime* and (2) the defendant did not know or understand the nature and consequences of his or her actions or that he or she did not know the difference between right and wrong. *State v. John*, 310 Neb. 958, 969 N.W.2d 894 (2022). Therefore, evidence that Ashing was insane at the time of the crime was necessary to prove her insanity defense.

However, the record discloses that trial counsel understood the need to prove insanity at the time of the crime. The following lines of questioning during the bench trial support this conclusion:

> [Trial counsel:] Okay. And so when you interviewed [Ashing] -- and I just want to make sure I have this clear. *A legal insanity is for the time of the indexed incident*; is that right?
>
> [Hartmann:] For the time of the index offense, yes.

(Emphasis supplied.)

And later,

- 6 -

[Trial counsel:] Okay. And do you believe based on all of the collateral information, your review and personal meeting with Ms. Ashing that she met the Nebraska legal definition of legally insane *at the time of the indexed offense*?
[Hartmann:] I do [think] that is the case.

(Emphasis supplied.)

Trial counsel also stated in her closing argument, "As we indicated previously, it's our burden of proof to show that this insanity -- that [Ashing] was insane -- legally insane *at the time of the event*." (Emphasis supplied.)

The record affirmatively refutes Ashing's claims that her trial counsel misunderstood the law governing insanity defenses. Rather, it shows that trial counsel properly understood insanity must be found to have occurred at the time of the crime, and that she adduced testimony relevant to this issue. Questions regarding events leading up to the day of the stabbing were used to prove that Ashing's command hallucinations and delusional ideas were not recently fabricated to exculpate herself; rather, they were well-documented and existed prior to the stabbing. And Hartmann testified that Ashing "being ill before the act occurred and found to be ill directly after the act occurred" led to his opinion that "she was mentally ill and psychotic when the act occurred." Thus, we reject Ashing's argument that trial counsel did not understand that Nebraska law requires a defendant to show how yesterday's symptoms are part of today's serious mental illness. This assigned error fails.

(b) Preparation of Expert Witness

Ashing also contends her trial counsel was ineffective because, "when proof of insanity requires the support of medical expert testimony, it is not a reasonable trial strategy to deny that medical expert witness critical medical records." Brief for appellant at 20. She asserts that, although she had been seeing a counselor and had prior mental health issues, Hartmann did not review records from her therapist, or any other mental health provider, when forming his opinion, nor did he obtain or review records to show what medications she was previously or currently prescribed. She asserts that the absence of such reliable sources for Hartmann's evaluation was either due to his failure to ask for her medical records, trial counsel's failure to provide them, or both. Ashing argues that the observations of medical personnel immediately following the stabbing may have provided important information about her state of mind at the time of the stabbing and may have assisted her in proving her insanity defense.

Although Ashing complains Hartmann did not review her therapy records with her "pre-event counselor," Ashing attended only one appointment sometime in June 2023 and did not attend any subsequent appointments. She faults trial counsel's failure to provide Hartmann with records of Ashing's evaluation that took place immediately after her arrest, but Hartmann testified that although he never reviewed additional medical records he requested, he had enough information to be confident in his conclusion that Ashing was insane at the time of the stabbing. This included information from a jail official that Ashing was calm but deemed suicidal upon her arrival at jail; however, she was deemed fit for confinement.

Hartmann's opinion was based in part upon information he obtained from other non-medical personnel who witnessed Ashing at the time of the stabbing. Dauel had informed him

that "after . . . the stabbing, [Ashing] 'became like a robot'" and that he thought she "was not right in the head." Dauel also reported that Ashing did not say anything after stabbing him but "just had a blank stare" and waited for police to arrive.

Hartmann had also reviewed police reports, which described that Ashing had told officers after the stabbing that she had suicidal ideations. The police reports also stated that Ashing had informed a nurse at the hospital that she had a gun and had planned on committing suicide.

Further, Hartmann was told Ashing was put on suicide precaution as soon as she arrived at the jail and that she talked about hearing voices in her head. He was also informed Ashing started virtual visits with a psychiatrist within 2 days of her arrival because jail staff felt "she had psychiatric needs." His report notes Ashing was placed on an antidepressant medication following this virtual meeting, and that she was later placed on an antipsychotic medication.

Thus, the record discloses that Hartmann's expert opinion was formed with consideration of observations of Ashing at the time of and soon after the stabbing, even if such information did not come from medical records. It is also clear that Hartmann was aware of medications Ashing was prescribed after she arrived at jail. Therefore, counsel was not ineffective by failing to provide either therapy or medical records to Hartmann.

We note that the district court found Jones-Thurman a more credible witness in part because her opinion focused on the absence of corroboration of severe or significant mental health issues at the time of the stabbing. The court recounted the steps Ashing took on the day of the stabbing, including scheduling a meeting with Dauel, driving to their home, hiding a knife behind her back, and "plead[ing] the Fifth." It agreed with Jones-Thurman that these events showed Ashing understood the nature and consequences of stabbing Dauel. Although Hartmann testified that someone in a psychosis can do things that would seem rational, the district court chose to accept Jones-Thurman's opinion over that of Hartmann. The weight and credibility of an expert's testimony are a question for the trier of fact. *State v. McGhee*, 280 Neb. 558, 787 N.W.2d 700 (2010).

Based on the above, Ashing cannot show a reasonable possibility the result of the proceeding would have been different had Hartmann obtained the medical records of which she now complains. This argument fails.

(c) Failure to Recall Dauel as Defense Witness

Ashing argues that her trial counsel was ineffective because counsel failed to recall Dauel and adduce additional details of her "remarks, posture, countenance[,] and actions in the 'ten, fifteen minutes' between Dauel's arrival and the stabbing." Brief for appellant at 26. She contends that "ignoring the only eyewitness to [her] mental state at the time of the stabbing, and failing to develop readily available evidence on that point," was not a reasonable trial strategy. *Id*.

Ashing fails to identify what questions could have been asked of Dauel that would have contributed to her insanity defense. Absent details regarding what information could have been elicited, the allegation of ineffective assistance of counsel is insufficiently pled. See *State v. Sinkey*, 303 Neb. 345, 929 N.W.2d 35 (2019) (holding that allegations that counsel "lightly" cross-examined two witnesses was insufficiently pled due to absence of detail regarding what questions should have been asked that would have contributed to defense).

Notwithstanding the insufficiency of Ashing's assigned error, we note that the State called Dauel and elicited much of the testimony related to Ashing's behavior and demeanor after he had arrived at their home but prior to the stabbing. Dauel testified that Ashing was "not herself" and appeared "like a zombie" when he arrived at the house. He tried to converse with her, but she only gave short, one-word answers. After she asked for a hug and swung the knife, cutting his neck, he continuously asked her "why;" Ashing "wasn't really responding" but eventually she stated that he "had ruined her life." She then stabbed him.

The State adduced ample evidence of Ashing's "remarks, posture, countenance[,] and actions" between the time Dauel arrived at the house and the stabbing. Brief for appellant at 26. Any examination by trial counsel would have been redundant; therefore, counsel's performance was not deficient. This claim likewise fails.

## 2. INSANITY DEFENSE

Ashing assigns that, in the event we determine trial counsel was not ineffective, "the district court [regardless] erred by finding that the State met its burden to prove [she] was sane at the time of the stabbing." Brief for appellant at 3. She argues that once a criminal defendant introduces any evidence of insanity, the burden of proof passes to the State. The State counters that it is the criminal defendant who is required to prove insanity by a preponderance of the evidence, and the burden to prove sanity does not lie with the State.

Neb. Rev. Stat. § 29-2203 (Reissue 2016) provides, in relevant part, that

[a]ny person prosecuted for an offense may plead that he or she is not responsible by reason of insanity at the time of the offense and in such case *the burden shall be upon the defendant to prove the defense of not responsible by reason of insanity by a preponderance of the evidence*.

(Emphasis supplied.)

We reject Ashing's claim that the burden of proof shifted to the State after she presented evidence that she was insane at the time of the offense. It is clear Nebraska law places the burden on a defendant to prove his or her insanity defense by a preponderance of the evidence. See § 29-2203. Consequently, Ashing's assignment of error constitutes a misunderstanding of the law, and we thus reject it. For completeness, we recognize that the verdict of the finder of fact on the issue of insanity will not be disturbed unless there is insufficient evidence to support such a finding. See *State v. John*, 310 Neb. 958, 969 N.W.2d 894 (2022). Having reviewed the evidence, we find it sufficient to support the district court's verdict.

## 3. SENTENCING PLAIN ERRORS

The State argues that Ashing's sentence constitutes plain error because the "use" conviction in count II was not run consecutively to all other sentences as statutorily required. We agree.

A sentence that is contrary to the court's statutory authority is an appropriate matter for plain error review. *State v. Roth*, 311 Neb. 1007, 977 N.W.2d 221 (2022). Consideration of plain error occurs at the discretion of an appellate court. *Id.* Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially

affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *Id*.

The power to define criminal conduct and fix its punishment is vested in the legislative branch, whereas the imposition of a sentence within these legislative limits is a judicial function. *Id*. A sentence is illegal when it is not authorized by the judgment of conviction or when it is greater or less than the permissible statutory penalty for the crime. *Id*. And an appellate court has the power on direct appeal to remand a cause for the imposition of a lawful sentence where an erroneous one has been pronounced. *Id*.

Here, the district court's sentencing order states that Ashing was sentenced, on count I, to 20 to 25 years' imprisonment, with 526 days' credit for time previously served. On count II, she was sentenced to 5 to 10 years' imprisonment; on count III, to 2 to 4 years' imprisonment; and, on count IV, to 1 year to 1 year imprisonment. The sentences imposed for counts I and II were ordered to run consecutive to one another, and the sentences for counts III and IV were to run concurrent to those imposed for counts I and II.

The State asserts that the district court erred by ordering some of Ashing's sentences to run concurrent to the sentence imposed for her conviction of use of a deadly weapon to commit a felony under count II. We also note another plain error by the district court related to its award of credit for time previously served.

(a) Sentence for "Use" Conviction

Neb. Rev. Stat. § 28-1205 (Cum. Supp. 2024) provides that use of a deadly weapon is a Class II felony, and that "[a] violation of this section shall be treated as a separate and distinct offense from the underlying crimes being committed, and a sentence imposed under this section shall be consecutive to any other sentence imposed." Ashing's sentence for her conviction of use of a deadly weapon to commit a felony under count II does not comply with § 28-1205 because, although it was ordered to run consecutively to the sentence on count I, it was ordered to run concurrently to the sentences imposed on counts III and IV. This constitutes plain error.

We accordingly vacate the sentences imposed under counts II, III, and IV, and remand the cause with directions that the district court resentence Ashing such that the sentence imposed for her conviction of use of a deadly weapon under count II runs consecutively to any other sentences imposed and not concurrently with any other sentence, and that the sentences for counts III and IV not be ordered served concurrently with the sentence for use of a deadly weapon. See *State v. Ramirez*, 287 Neb. 356, 842 N.W.2d 694 (2014) (vacating sentences and remanding with directions to comply with § 28-1205).

(b) Credit for Time Served

The Nebraska Supreme Court recently held in *State v. Nelson*, 318 Neb. 484, 16 N.W.3d 883 (2025), that when a court imposes multiple sentences contemporaneously, whether such sentences are ordered to be served consecutively or concurrently, all available credit for time served under Neb. Rev. Stat. § 83-1,106(1) (Reissue 2024) is applied just once, to the aggregate of all terms imposed. It also clarified that when a court applies all available credit against the aggregate of all sentences imposed contemporaneously, there is no reason to mechanically attach such credit to any particular sentence. See *Nelson, supra*. The formality of identifying just one

sentence to receive all available credit is neither accurate, nor necessary, when all available credit is being applied to the aggregate of all terms imposed. *Id*.

Here, the court's order stated "Count I, Attempted First Degree Murder, Class II Felony, to an indeterminate term of not less than twenty (20) years and not more than twenty-five (25) years in an institution under the jurisdiction of the Nebraska Department of Corrections with credit for five hundred twenty-six (526) days previously served." Because credit for time served must be awarded against the aggregate of all sentences imposed, rather than one particular sentence, the district court's award of credit constitutes plain error.

Although, in *Nelson, supra*, the Court modified the award of credit on appeal, because we have vacated the sentences imposed under counts II, III, and IV, and remanded the cause for resentencing, we instead include additional instructions for the court on remand. We instruct the district court, after it has resentenced Ashing, to modify the sentencing order to state that "Ashing is entitled to 526 days of credit for time served against the aggregate of all terms imposed."

## VI. CONCLUSION

For the foregoing reasons, we find that Ashing's assignments related to ineffective assistance of counsel and her insanity defense fail. We therefore affirm the verdict. However, we find plain error in the district court's sentences for failure to comply with § 28-1205. We therefore vacate the sentences on counts II, III, and IV, and remand the cause to the court with directions to resentence Ashing so that the sentence for the use of a deadly weapon conviction runs consecutively to all other sentences. We also instruct the district court to modify its sentencing order to apply Ashing's credit for time previously served against the aggregate of the sentences imposed. We otherwise affirm.

AFFIRMED IN PART, AND IN PART VACATED

AND REMANDED WITH DIRECTIONS.

- 11 -